| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| *versus* | § | CASE NO. 4:14-CR-76 |
| | § | |
| NEAL RAVON TAYLOR | § | |

### MEMORANDUM AND ORDER

Pending before the court is Defendant Neal Ravon Taylor's ("Taylor") *pro se* Motion for Compassionate Release (#72), wherein he requests compassionate release due to medical circumstances.  The Government filed a response in opposition to Taylor's motion (#73).  United States Probation and Pretrial Services ("Probation") conducted an investigation and recommends that the court deny Taylor's motion for compassionate release.  Having considered the pending motion, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.   Background

On April 9, 2014, a grand jury in the Eastern District of Texas returned an Indictment charging Taylor in Count 1 with Conspiracy to Distribute and Possess with the Intent to Distribute Cocaine, in violation of 21 U.S.C. § 846, from June 2010 to December 12, 2013; and in Count 2 with Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h), from June 2010 to December 12, 2013.  On September 28, 2015, Taylor pleaded guilty pursuant to a non-binding plea agreement to Count 1 of the Indictment.  On February 29, 2016, the court sentenced Taylor to 155 months' imprisonment, followed by a 5-year term of supervised release.  Taylor is currently housed at Big Spring Federal Correctional Institution ("FCI Big Spring"), located in Big Spring, Texas.  His projected release date is September 5, 2026.

II.     Compassionate Release

On December 21, 2018, former President Trump signed the First Step Act of 2018 into law. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *See United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."), *cert. denied*, ___ U.S. ___, No. 20-5997, 2020 WL7132458 (Dec. 7, 2020); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP). The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *United*

2

*States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019).  The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *Franco*, 973 F.3d at 467 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release.").  Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Franco*, 973 F.3d at 467 ("The text . . . outlines two routes a defendant's motion can follow to be properly before the court.  Both routes begin with the defendant requesting that 'the [BOP]' 'bring a motion on the defendant's behalf.'"); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his

administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

Here, Taylor is foreclosed from obtaining relief because he has not submitted a request for compassionate release to the warden of the facility where he is housed. Attached to Taylor's motion is a hand-written request for compassionate release, dated April 20, 2020, which he claims he submitted to the warden of FCI Big Spring. In its investigation, however, Probation found that FCI Big Spring has no record of Taylor ever filing such a request with the warden. *See Franco*, 973 F.3d at 468 ("Congress has commanded that a 'court *may not* modify a term of imprisonment' if a defendant has not filed a request with the BOP."); *Alam*, 960 F.3d at 832 ("[B]ecause this exhaustion requirement serves valuable purposes (there is no other way to ensure an orderly processing of applications for early release) and because it is mandatory (there is no exception for some compassionate-release requests over others), we must enforce it."); *United States v. Garcia*, No. CR 2:18-1337, 2020 WL 3000528, at *3 (S.D. Tex. June 2, 2020) ("While the Court sympathizes with Defendant's plight, because he has failed to comply with the exhaustion requirements under § 3582, his motion is not ripe for review, and the Court is without jurisdiction to grant it."); *United States v. Garcia-Mora*, No. CR 18-00290-01, 2020 WL 2404912, at *2 (W.D. La. May 12, 2020) ("Section 3582(c)(1)(A) does not provide [the court] with the equitable authority to excuse [the defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period."); *United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *2 (W.D. La. Apr. 20, 2020); *see also Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1857 (2016) ("[J]udge-made exhaustion doctrines . . . remain amenable to judge-made exceptions," whereas "mandatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing

judicial discretion."). Accordingly, at this time, the court does not have the authority to grant the relief Taylor requests. Moreover, even if Taylor had complied with the exhaustion requirement before filing the instant motion, nothing in his motion indicates that extraordinary and compelling reasons exist to release him from confinement.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG"). In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances: (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason. The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[1] as applicable, and find that the sentence modification is consistent with the

---

[1] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

policy statements issued by the Commission. 18 U.S.C. § 3582(c)(1)(A). The policy statement regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

### A. Medical Conditions

In the instant motion, Taylor, age 46, contends that he is eligible for compassionate release due to his asthma, cardiovascular disease, respiratory disease, diabetes, allergenic rhinitis, chronic sinitus, high cholesterol, holosystolic murmur, low lung volume, kidney disease, 25-year history of smoking, and because he is immunocompromised. He also claims that he has a family history of cardiovascular disease. Taylor's reliance on his family history of various medical problems to establish extraordinary and compelling reasons for compassionate release is misplaced. A family history of certain afflictions and a fear of developing medical problems do not create a current medical diagnosis, nor do they diminish Taylor's present ability to provide self-care while incarcerated. *See generally United States v. Diggles*, No. 9:15-CR-00024-RC, 2020 WL 6471725, at *3 (E.D. Tex. Sept. 9, 2020), *adopted by* No. 9:15-CR-24-RC, 2020 WL 6450469 (E.D. Tex. Nov. 2, 2020).

The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the

6

environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

Here, according to Taylor's Presentence Investigation Report ("PSR"), prepared in 2015, his medical history includes asthma. Taylor reported that he has had asthma since his childhood and it is treated with an albuterol inhaler. Taylor also stated that he experienced pain in his shoulder and back as a result of a car accident from several years ago, but he claimed that the pain was manageable. Otherwise, Taylor reported that he was in good health. Taylor's PSR also states that in 2015, he was 5 feet, 8 inches tall and weighed 205 pounds, resulting in a Body Mass Index ("BMI") of 31.2, indicating that he was obese according to guidelines from the Centers for Disease Control and Prevention ("CDC"). Taylor's BOP medical records reveal that, by 2018, Taylor maintained his height and weighed 235 pounds, resulting in a BMI of 35.7, increasing his obesity. That year, Taylor had testing done that indicated his cardiac silhouette to be normal but noted that he had relatively low lung volumes. In 2019, Taylor's medical records reflect that he suffered from asthma, allergies, and foot pain, resulting from having a flat right foot and hammer toes. Taylor's asthma has been controlled with an albuterol inhaler and a mometasone furoate inhaler. He also suffers from various allergy symptoms due to his allergic rhinitis, chronic sinusitis, and chronic rhinorrhea. His allergy symptoms, which are heightened in the spring and when the weather changes, exacerbate his asthma. Taylor was prescribed fluticasone propionate nasal spray for treatment of his allergies.

Taylor's medical records from March 2019 indicate that a holosystolic murmur in his heart was detected. Later, in an August 27, 2019, appointment, Taylor's medical provider also noticed a murmur. Taylor had an echocardiogram administered due to the detected murmur, which

identified a mild insufficiency in his heart's mitral valve. In November 2019, Taylor was diagnosed with a staphylococcus skin infection on his left buttocks, which was treated with antibiotics and ibuprofen. His skin problems have persisted, with Taylor's medical records showing that he was suffering from a skin infection in the lower right quadrant of his abdomen as of June 2020. In July 2020, Taylor had blood work done, which reflected that he had high levels of creatinine, bilirubin, and hemoglobin A1c, along with high cholesterol. He is now prescribed atorvastatin to control his cholesterol levels. Taylor's records also indicate that he is at risk for developing atherosclerotic cardiovascular disease ("ASCVD"). Specifically, Taylor has a 10-year ASCVD risk of 8.0%, but there is no indication that he currently has cardiovascular disease, as he claims. Similarly, contrary to Taylor's assertion, while his high level of hemoglobin A1c indicates he is at an increased risk for developing diabetes, there is nothing in his medical records showing that he has ever been diagnosed with diabetes. There is also no indication that he has been diagnosed with kidney disease or any mention of him being immunocompromised. Taylor's medical records show that he is classified as a BOP Care Level 1 inmate (healthy or simple chronic care). According to the BOP Clinical Practice Guidance, "Care Level 1 inmates are less than 70 years of age and are generally healthy." "They may have limited medical needs that can be easily managed by clinician evaluations every 6-12 months."

    This medical summary does not meet the criteria listed above. None of these medical conditions is terminal or substantially diminishes his ability to provide self-care. *See United States v. Thompson*, ___F.3d___, No. 20-40381, 2021 WL 37493, at *2 (5th Cir. Jan. 5, 2021). The court acknowledges that some of Taylor's underlying medical conditions, according to the CDC

website, may place him at a higher risk of severe symptoms should he contract COVID-19[2]; nonetheless, such commonplace maladies (obesity, high cholesterol, and asthma), do not make Taylor's case "extraordinary." *Id.* at *2 (noting that "nearly half of the adult population in the United States suffers from hypertension . . . [a]nd roughly 12% of Americans suffer from high cholesterol"); *United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (holding that the defendant's chronic "extensive allergies" was not a sufficient medical condition warranting compassionate release), *aff'd*, 829 F. App'x 73 (5th Cir. 2020); *United States v. Pagan Zapata*, No. 3:18-CR235-S, 2020 WL 4464660, at *1 (N.D. Tex. Aug. 3, 2020) (finding that the defendant's long-term asthma, which was being treated with an inhaler, was not a sufficient medical condition under the Guidelines to merit compassionate release). Indeed, Taylor's BOP records reveal that he has regular duty work assignments and is cleared for food service. In any event, his asthma, obesity, and other medical problems did not hamper or prevent him from committing a series of crimes over the years, including his offense of conviction. Moreover, "compassionate release is discretionary, not mandatory," and may be denied even when a prisoner has a serious medical condition where, as here, he has engaged in "severe" criminal conduct and has an extensive criminal history. *United States v. Chambliss,* 948 F.3d 691, 693-94 (5th Cir. 2020). Thus, Taylor has failed to establish that a qualifying medical condition exists that would constitute extraordinary and compelling reasons to reduce his sentence.

---

[2] In relevant part, the CDC states that adults with obesity and a history of smoking are at an increased risk of severe illness, while adults with asthma and high blood pressure might be at an increased risk for severe illness. According to the CDC, 42.5% of the adult population of the United States is obese and 7.7% have asthma.

B.  "Other" Reasons

Taylor's request for compassionate release potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D). Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that courts are in the position to determine whether extraordinary and compelling circumstances are present. *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

In the case at bar, there is no indication that the BOP Director made a determination regarding the presence of extraordinary and compelling reasons with respect to Taylor for any "other" reason. In exercising its discretion, the court, likewise, finds that no extraordinary and compelling reasons exist in relation to Taylor's situation. Although Taylor provides the court with a list of courses he has taken and commendable goals, he has not presented any "other reasons" warranting compassionate release. In fact, although Taylor claims in his motion that "RDAP was

10

a true eyeopener" and "it changed my life tremendously," he fails to mention that BOP records disclose that he failed out of the residential drug abuse treatment program and that he is ineligible for a reduction in sentence under 18 U.S.C. § 3621 for successful completion of the program. Moreover, although the court may consider rehabilitation efforts, "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13 cmt. n.3; *accord* 28 U.S.C. § 994(t); *see United States v. Brooker*, 976 F.3d 228, 237-38 (2d Cir. 2020) (holding that a district court's discretion in sentencing is broad; however, there is a "statutory limit on what a court may consider to be extraordinary and compelling . . . [and] '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" (quoting 28 U.S.C. § 994(t))); *United States v. Hudec,* No. CR 4:91-1-1, 2020 WL 4925675, at *5 (S.D. Tex. Aug. 19, 2020) ("While the Court is permitted to consider post-sentencing rehabilitation in determining whether to grant an eligible defendant a sentence reduction, it is not authorized to grant a reduction based upon post-sentencing rehabilitation alone."). Furthermore, in view of his criminal history, his history of poly-substance abuse, and his failure to complete the residential drug abuse treatment program, the court cannot conclude that Taylor would not pose a danger to the safety of any other person or to the community, if released from confinement. Hence, Taylor has not presented any "other reasons" that satisfy the requirements of the First Step Act regarding compassionate release.

Taylor maintains that if he contracts COVID-19 it will be fatal for him due to prison overcrowding and there being no way to distance himself from other inmates. Nevertheless, as of February 1, 2021, the figures available at www.bop.gov list 5 inmates (out of a total inmate population of 1,001) and 11 staff members at FCI Big Spring as having confirmed positive cases

of COVID-19, 785 inmates and 0 staff members who have recovered, and 3 inmates who have succumbed to the disease. Thus, it appears that the facility where Taylor is housed is handling the outbreak appropriately and providing adequate medical care.

Although Taylor expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Taylor, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated. *See Thompson*, 2021 WL 37493, at *3 ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Banks*, No. CR 15-0080-02, 2020 WL 6839267, at *4 (W.D. La. Nov. 20, 2020) ("This Court cannot equate the generalized fear of COVID-19 to an extraordinary and compelling reason to support compassionate release, nor will it undermine BOP's criteria to determine eligibility for sentence reductions or home confinement."); *United States v. Woods*, No. 4:11-CR-106-SDJ, 2020 WL 6391591, at *4 (E.D. Tex. Nov. 2, 2020) (noting that "courts have concluded that an inmate's concerns about risks associated with the spread of COVID-19 are not consistent with the policy statement of the Commission as required by Section 3582(c)(1)(A)"); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 292 (W.D. La. 2020))); *United States v. Clark*, 451

F. Supp. 3d 651, 656 (M.D. La. 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See Jackson*, 2020 WL 4365633, at *2 (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19). Therefore, Taylor has failed to establish that a qualifying medical condition or other reasons exist that would constitute extraordinary and compelling reasons to reduce his sentence to time served and release him from prison.

The court further finds that compassionate release is not warranted in light of the applicable factors set forth in § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *Thompson*, 2021 WL 37493, at *3 n.11 (collecting cases); *Chambliss*, 948 F.3d at 693-94. Taylor's conviction stems from his participation in a multi-state, drug-trafficking and money laundering conspiracy. From June 2010 until December 13, 2013, Taylor conspired with others to distribute cocaine and to launder the drug proceeds. On December 7, 2012, agents tracked a cell phone signal associated with drug-trafficking activity to various locations in St. Louis, Missouri, and Dallas, Texas, including in two residences belonging to Taylor. On January 7, 2013, agents observed Taylor taking a flight from Dallas to St. Louis. After arriving in St. Louis, agents placed two individuals who were identified as Taylor's couriers under surveillance. The couriers departed St. Louis in a vehicle, and Taylor

took a flight back to Dallas that same day. The couriers' vehicle was stopped for a traffic violation in Phelps County, Missouri. A search of the vehicle revealed $208,935 in currency concealed in a hidden compartment.

On October 31, 2013, a cooperating individual ("CI") met with Taylor while being recorded and under surveillance. The CI and Taylor negotiated a deal for the sale of 8 kilograms of cocaine at a cost of $28,500 per kilogram. On November 2, 2013, they met at an auto dealership and, from there, went to an undercover warehouse. The CI retrieved a duffle bag containing 5 kilograms of cocaine and gave 1 kilogram to Taylor after which Taylor passed the CI a bundle of currency. When the CI and Taylor were leaving the warehouse, they were stopped for a traffic violation. A search of the vehicle revealed one kilogram of cocaine, and both the CI and Taylor were arrested. In his plea agreement and in the factual basis, Taylor stipulated that he was responsible for the distribution of 150 kilograms or more of cocaine.

Further, as detailed in his PSR, from June 2010 to December 2013, Taylor conspired with others to conduct and attempt to conduct financial transactions that involved proceeds derived from the distribution of cocaine, knowing the financial transactions were designed to conceal and disguise the nature of the illegal proceeds. Taylor incorporated shell corporations, opened bank accounts for the corporations, deposited illegal proceeds into the accounts, and used the funds to buy real estate, purchase airline tickets, cover travel expenses, and pay for utilities. The proceeds were transported from New York and Missouri to Texas by way of vehicle or common carrier. This scheme resulted in the laundering of approximately $500,000 of drug proceeds.

Taylor's criminal history began at age 17 and includes prior convictions for possession with intent to distribute a controlled substance (cocaine), uttering counterfeit obligations, driving

while intoxicated (2), and conspiracy to possess with intent to distribute a controlled substance (cocaine). In addition, he failed to comply with previous terms of probation and bond. Further, Taylor has a lengthy history of substance abuse beginning at age 12, drinking alcohol and smoking marijuana on a daily basis and using cocaine three to four times a week until his arrest at age 40. He failed to comply with the conditions of his pretrial release by leaving the district, leading to his arrest in Shreveport, Louisiana, for forgery, and his lying about his employment status for several months, which allowed him to circumvent the conditions of electronic monitoring and home confinement. As a result, Taylor was denied a sentence adjustment for acceptance of responsibility. In view of the circumstances surrounding his offense of conviction, his criminal history, and his history of poly-substance abuse, the court cannot conclude that Taylor would not pose a danger to any other person or to the community, if released from prison at this time.

In addition, granting Taylor compassionate release would fail to provide just punishment for his offense and promote respect for the law. In *Chambliss*, the United States Court of Appeals for the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a significant portion of his sentence. *Id.* at 694. The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94; *see Thompson*, 2021 WL 37493, at *3 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns"). "Moreover, the [district] court,

15

citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Chambliss*, 948 F.3d at 693-94.  In the instant case, releasing Taylor after he has served approximately 50% of his 155-month sentence would similarly minimize the impact of his crime and the seriousness of his offense.

In his Memorandum to the BOP dated March 26, 2020, former Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates.  He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways."  The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease.  Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one."  No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)).  Here, Taylor's track record is

similarly a poor one. In this instance, there is no reason to believe that Taylor would not revert to his drug-dealing and drug-abusing activities if released from prison at this juncture.

In short, Taylor has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 455 F. Supp. 3d at 291-92 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 455 F. Supp. 3d at 292.

III. Conclusion

Consistent with the foregoing analysis, Taylor's Motion for Compassionate Release (#72) is DENIED.

SIGNED at Beaumont, Texas, this 1st day of February, 2021.

*Marcia A. Crone*
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE